<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CHRISTOPHER MASSEY, <br><br> Plaintiff, <br><br> v. <br><br> BOROUGH OF BERGENFIELD, ARVIN AMATORIO, HERNANDEZ RIVERA, ORA KORNBLUTH, RAFAEL MARTE, AND BUDDY DEAUNA, <br><br> Defendants. | Civil Action No. 20-01942 <br><br> **OPINION** <br><br> September 11, 2024 |

**SEMPER**, District Judge.

Before the Court is Defendants Borough of Bergenfield (the "Borough"), Arvin Amatorio, Hernandez Rivera, Ora Kornbluth, Rafael Marte, and Buddy Deauna's (collectively "Defendants") motion for summary judgment. (ECF 110.) Plaintiff Christopher Massey ("Plaintiff" or "Massey") filed a brief in opposition to the motion. (ECF 114, "Opp.") Defendants filed a reply brief. (ECF 116, "Reply.") The Court reviewed the parties' submissions and decided the motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendants' motion for summary judgment is **GRANTED.**

**I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY**[1]

---

[1] The facts and procedural history are drawn from the Complaint, (ECF 1, "Compl."), the parties' submissions regarding undisputed material facts (ECF 110-2, Defendants' Statement of Undisputed Material Facts ("DSMF"), ECF 114-3, Plaintiff's Counterstatement of Undisputed Material Facts, ("PCSMF"), and ECF 114-2, Plaintiff's Supplemental Statement of Undisputed Material Facts "Supp. SMF"), Defendants' brief in support of its motion for summary judgment (ECF 110-1, "Def. Br."), Plaintiff's opposition brief (ECF 114, "Opp."), and Defendants' reply brief. (ECF 116, "Reply.")

This case arises from the 2019 selection of the Bergenfield Police Department's ("BPD") Chief of Police. Plaintiff Massey, who is Caucasian, alleges that the Defendants wrongfully discriminated against him when they selected Mustafa Rabboh, who is Palestinian and Muslim, to be Chief of Police instead of Plaintiff. (*See generally* Compl.)

### A. Christopher Massey

In or about January 1995, Christopher Massey was hired by the BPD as a patrolman/officer.[2] (DSMF ¶ 1.) In or about 2003, Plaintiff took the New Jersey Civil Service test and was promoted to sergeant within the BPD.[3] (*Id.* ¶ 4.) As a sergeant, Plaintiff was assigned to the patrol division. (*Id.* ¶ 5.) Plaintiff supervised patrol officers, monitoring and mentoring those officers daily. (*Id.*) Throughout his tenure as a sergeant, Plaintiff was only assigned to the patrol division, and he never worked in the Detective Bureau. (*Id.* ¶¶ 8-9.) At the time, seven other sergeants worked in the patrol division. (*Id.* ¶ 7.)

In or about 2007, Plaintiff was promoted to lieutenant[4] in the Patrol Division. (*Id.* ¶ 10.) As a lieutenant, Plaintiff oversaw a platoon. (*Id.* ¶ 11.) He was responsible for mentoring and training sergeants and ensuring they properly supervised the dispatchers and patrolmen. (*Id.*) If no sergeant was working with Plaintiff, Plaintiff would act as a sergeant himself. (*Id.*) Moreover, Plaintiff was in charge of field training for the entire patrol division. (*Id.* ¶ 12.) As a lieutenant, Plaintiff became the main investigator for Internal Affairs, liaison for the BPD and Bergenfield schools, liaison for the BPD and the Bergen County Prosecutor's Office, liaison with Civil Service,

---

[2] "During an assigned tour of duty, on foot, or in an automobile, [a patrolman/officer] patrols a designated area to provide assistance and protection for persons, to safeguard property, to assure observance of the law, and to apprehend law-breaks; does related work as required." (DSMF ¶ 3.)

[3] "Under supervision of a Police Lieutenant during an assigned Tour of duty, [a sergeant] has charge of police activities intended to provide Assistance [sic] and protection for persons, safeguard property, and assure observance of the laws, and apprehends lawbreakers; does related work as required." (DSMF ¶ 6.)

[4] "Under the supervision of the Police Captain during an assigned tour of duty, [a lieutenant] has charge of a police platoon or performs specialized supervisory police duties; does related work as required." (DSMF ¶ 18.)

and conducted background investigations for new hires. (*Id.* ¶ 14.)

In 2009, Plaintiff was assigned to be a lieutenant in the Detective Bureau. (*Id.* ¶ 13.) In this role, Plaintiff was tasked with more administrative work than in his role as lieutenant in the Patrol Division. (*Id.* ¶ 15.) From about 2009 until 2012, Plaintiff worked solely as a lieutenant in the Detective Bureau and conducted all Internal Affairs investigations. (*Id.* ¶ 17.)

### B. Plaintiff's Promotion to Captain and Cathy Madalone

In or around 2012, Plaintiff was promoted to captain.[5] (*Id.* ¶ 19.) He was a commander of patrol/operations and the Detective Bureau. (*Id.*) Plaintiff remained in these positions throughout his tenure as a captain. (*Id.*) As captain and commander of operations, Plaintiff was responsible for all the dispatchers, lieutenants, sergeants, and patrol officers on patrol. (*Id.* ¶ 22.) He reviewed all reports that came through patrol, ensured they were properly executed, and signed off on the reports. (*Id.*)

Cathy Madalone and Plaintiff were both promoted to captain within the BPD. (*Id.* ¶ 20.) As a captain, Madalone was the commander of Traffic and Records. (*Id.* ¶ 21.) If Cathy Madalone was absent, Plaintiff would oversee Traffic and Records and take a less hands-on approach compared to Madalone's. (*Id.* ¶ 23.)

In mid to late 2015, Madalone was promoted to Chief of Police over Plaintiff. (*Id.* ¶¶ 25-26.) On June 21, 2016, Plaintiff was promoted to Deputy Chief of the BPD.[6] (*Id.* ¶ 27.) As Deputy Chief, Plaintiff was given additional duties he did not have in his role as a captain, including responsibility for the annual report to document department wellbeing and responsibility for

---

[5] "Under the supervision of the Chief or Deputy Chief of Police during an assigned tour of duty, [a captain] has charge of subordinates engaged in activities intended to provide assistance and protection for persons, safeguard property, assure observance of the laws, and apprehend lawbreakers; does related work as necessary." (DSMF ¶ 24.)

[6] "[Deputy Police Chief a]ssists to the police chief in management and discipline of a county or municipal police department; does other related duties." (DSMF ¶ 29.)

3

equipment purchases and reserves. (*Id.* ¶ 28.) Prior to Plaintiff being named Deputy Chief, the Deputy Chief position was nonexistent for approximately twenty years. (*Id.* ¶ 30.) It was recreated by an ordinance. (*Id.*) The Deputy Chief position was created for Plaintiff after Madalone requested such creation from the Bergenfield Mayor and Council. (*Id.* ¶ 31.)

Defendants assert that "[t]he return of the Deputy Chief position was not done so that Plaintiff would not be skipped over for a chief of police promotion." (*Id.* ¶ 32.) Plaintiff denies this assertion, and instead states that "[t]he Council understood that promoting Plaintiff to Deputy Chief would provide the BPD with a 'defined succession plan' for the rank of Chief upon Madalone's retirement especially considering how close the vote between Plaintiff and Madalone was." (PCSMF ¶ 32.) While Madalone was Chief, Plaintiff was named officer in charge in her absence. (DSMF ¶ 33.)

### C. Mustafa Rabboh

In September 2003, the BPD hired Mustafa Rabboh ("Rabboh") as a lateral transfer. (*Id.* ¶ 35.) Prior to this, Rabboh worked as an officer in the Paterson Police Department. (*Id.* ¶ 36.) In or about 2009, Rabboh took the New Jersey Civil Service test. (*Id.* ¶ 37.) He was the top scorer, and he was promoted to sergeant in the BPD. (*Id.*) As a sergeant, Rabboh was assigned to the Patrol Division, as Plaintiff was during his time as a sergeant. (*Id.* ¶ 38.)

In or about 2012, Rabboh took the New Jersey Civil Service test. (*Id.* ¶ 39.) He was the top scorer, and he was promoted to lieutenant in the BPD. (*Id.*)

In or about 2015, Rabboh was promoted to captain. (*Id.* ¶ 40.) For a time, Plaintiff and Rabboh were simultaneously captains within the BPD. (*Id.* ¶ 41.) As a captain, Rabboh was assigned to Records and Traffic. (*Id.* ¶ 42.) He also oversaw scheduling and accreditation. (*Id.* ¶ 43.) Prior to this, Madalone handled accreditation for fifteen years. (*Id.* ¶ 44.) Plaintiff neither

handled nor took charge of the BPD accreditation process. (*Id.* ¶ 45.) Defendants assert that Plaintiff was never assigned to or worked in Records or Traffic, while Plaintiff asserts he was in charge of Records and Traffic as officer in charge under Madalone for about five to six months. (*Id.* ¶ 46; PCSMF ¶ 46.) Plaintiff trusted Rabboh and, on several occasions, named him officer in charge in Plaintiff's absence. (DSMF ¶ 47.)

In 2019, then Chief of Police Madalone took an extended medical leave. (*Id.* ¶ 49.) During this time, Plaintiff was named officer in charge. (*Id.*) Chief Madalone ultimately retired, and the BPD needed a new Chief of Police. (*Id.* ¶ 50.) Based on an August 1, 2019 New Jersey Civil Service Commission Promotional Announcement, police officers who served as Deputy Police Chief or captain were eligible for a promotion to the position of Chief of Police. (*Id.* ¶ 51.) Both Plaintiff and Rabboh were eligible to apply. (*Id.* ¶ 52.) Rabboh was not required to submit a formal application to be considered for the Chief position. (*Id.* ¶ 53.)

### D. Chief of Police Interviews

The Chief of Police interviews were held on August 6, 2019 in a closed executive session of the Bergenfield Mayor and Council. (*Id.* ¶ 57.) The following individuals attended the interviews: former mayor Norman Schmelz, former council president and current councilmember Ora Kornbluth, councilmember Thomas Lodato, councilmember Buddy Deauna, councilmember and current mayor Arvin Amatorio, councilmember Hernando Rivera, councilmember Rafael Marte, Borough Administrator Corey Gallo, and Deputy Borough Clerk Hilda Tavitian. (*Id.* ¶ 58.)

In preparation for the Chief of Police interview, Rabboh contacted Madalone and requested a copy of a five-year plan she submitted when she interviewed for the Chief of Police position. (*Id.* ¶ 54.) She provided the plan to Rabboh via email. (*Id.*) Madalone also sent her five-year plan to Plaintiff, but Plaintiff did not "read it heartily." (*Id.* ¶ 55.) Defendants assert that in preparation for

the interview, Rabboh created his own five-year plan based on his own thoughts and ideas for the BPD, despite not being asked or required to submit one. (*Id.* ¶ 56.) Plaintiff disputes this notion and asserts that Rabboh's five-year plan mirrored Madalone's. (PCSMF ¶ 56.)

During his interview, Rabboh submitted his five-year plan to the mayor, counsel, and others present. (DSMF ¶ 59.) Those present at the interview asked Rabboh various question. (*Id.* ¶ 60.) When asked why he was more qualified than Plaintiff for the Chief position, Rabboh responded that he was there to tell interviewers what he brought to the table, and he would let other candidates speak for themselves. (*Id.* ¶ 61.) Rabboh discussed his strengths, including his social media involvement, tenure as the public information officer, community orientation, experience running the Youth Academy, and his desire to form a closer relationship between the Bergenfield community and the BPD. (*Id.* ¶ 63.) While Defendants assert that this focus on community interaction and outreach "caught the attention of some councilmembers[,]" Plaintiff asserts that this was not the case as some councilmembers found Rabboh's statements on this to be "a general description" or did not remember that aspect of his interview. (DSMF ¶ 64; PCSMF ¶ 64.) Defendants assert that Plaintiff did not discuss community interaction during his interview, but Plaintiff again disputes this assertion. (DSMF ¶ 64; PCSMF ¶ 64.) Plaintiff and Rabboh were asked similar questions during their interviews. (DSMF ¶ 70.) Plaintiff believed the interview process was a sham. (*Id.* ¶ 72.)

### E. The Vote for Chief

In Bergenfield, four councilmembers constitute a majority for voting purposes.[7] (*Id.* ¶ 78.) At the August 6, 2019 closed session meeting of the Council, councilmembers Marte, Deauna,

---

[7] Former Mayor Schmeltz was not eligible to vote unless there was a tie amongst the councilmembers. (DSMF ¶ 75.) Borough Administrator Gallo did not have the authority to promote anyone, including Plaintiff, to Chief as such decision was required to be voted on by Council at a regular open meeting. (*Id.* ¶ 76.) Defendants assert that Gallo did not recommend anyone for the Chief position. (*Id.* ¶ 77.) Plaintiff specifically denies this asserted fact, and instead

6

Amatorio, and Rivera stated their support for Rabboh for Chief, while Kornbluth and Lodato supported Plaintiff. (*Id.* ¶ 79.) On August 20, 2019, at the Bergenfield Regular Mayor and Council Meeting ("August 20 Meeting"), the Council took an official vote and named Rabboh Chief. (*Id.* ¶ 82.) Defendants assert Kornbluth changed her support from Plaintiff to Rabboh at this meeting. (*Id.* ¶ 81.) Plaintiff challenges this assertion, stating that Kornbluth did not have a choice but to change her vote to Rabboh because "[t]he vote was for Rabboh or no one else[.]" (PCSMF ¶ 81.)

Defendants state that at no time during the August 20 Meeting was it stated or implied that race was a motivating, influential, or deciding factor in promoting Rabboh to Chief of Police. (DSMF ¶ 83.) Plaintiff disputes this assertion and cites to the minutes from the August 20 Meeting, in which councilmembers made comments regarding the value of diversity, the diversity of Bergenfield, and the American Dream. (PCSMF ¶ 83.) Defendants assert that Bergenfield councilmembers and employees agreed race was not considered when promoting Rabboh to Chief. (DSMF ¶ 88.) Plaintiff denies this assertion and cites to testimony from Defendant Deauna in which Deauna stated Rabboh was better suited for Chief because he was more "energetic" and because "he's a minority." (PCSMF ¶ 83.)

During the relevant period, BPD retained a Recruitment/Equal Employment Opportunity General Order, which included an Affirmative Action Policy Statement. (DSMF ¶ 84.) The Affirmative Action Policy Statement provides: "Base decisions on employment so as to further the principal of equal employment opportunity and appropriate community representation while following the guidelines of the New Jersey Civil Service Commission." (*Id.* ¶ 84.) Plaintiff admits the BPD Order included the Affirmative Action Policy Statement, but he denies this is a material fact because the Affirmative Action Policy applies to hiring, not promotions. (PCSMF ¶¶ 84-85.)

---

asserts that Gallo recommended that Plaintiff be made Chief based on Gallo's strong working relationship with Plaintiff. (PCSMF ¶ 77.)

In his Supplemental Statement of Undisputed Material Facts, Plaintiff describes other statements made by Defendants at the August 20 Meeting. Defendant Marte stated that "Bergenfield is a safe and friendly town, but no one has named the one thing that makes it the best town to raise a family, which is the diversity." (Supp. SMF ¶ 154.) Defendant Marte also said that "Bergenfield appointed the first female Police Chief in 2015, and now has appointed the first Muslim Chief in 2015, and second in the State of New Jersey." (*Id.* ¶ 155.) Defendant Deauna stated that "the make-up of the Council is diversified, and we [were] able to achieve the American Dream." (*Id.* ¶ 156.) Defendant Amatorio also stated that Rabboh "expressed that he lives the American dream[]" and that "it was good to hear because many of the people in the audience, and even on the Council, share the same vision, experience and passion." (*Id.* ¶ 157.) Defendant Amatorio also stated that "this is a diverse town, audience, council, and we are proud to have you (Rabboh) as the next Chief of the Police Department." (*Id.* ¶ 158.) Defendant Rivera stated that he felt he "did the right thing" in voting for Rabboh, he was "proud[,]" and he hoped to "continue doing the right thing for the diverse community of Bergenfield." (*Id.* ¶ 158.) Plaintiff also states that Defendant Amatorio is Filipino (*id.* ¶ 13), Defendant Rivera is Colombian (*id.* ¶ 15), Defendant Deauna is Filipino (*id.* ¶ 17), and Defendant Marte is Dominican (*id.* ¶ 19).

Plaintiff's Complaint asserts three counts: Count 1: violation of 42 U.S.C. § 1983 based on violations of the equal protection clause (Compl. ¶¶ 32-34); Count 2: violation of the New Jersey Law Against Discrimination (*id.* ¶¶ 35-38); and Count 3: violation of 42 U.S.C. § 1981 based on alleged race discrimination. (*Id.* ¶¶ 39-41.) Defendants move for summary judgment on all three counts.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted if the movant shows that "there is no genuine issue as to any material fact [and] the moving party is entitled to a judgment as a matter of law." *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Del. River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an

9

affidavit."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23). Moreover, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48.

### III. ANALYSIS

#### A. Section 1983

Although Plaintiff's Complaint states that his Section 1983 claim is based on an equal protection violation, Defendants analyze Plaintiff's Section 1983 claim using a procedural due process standard. (Def. Br. at 5-9.) In his opposition brief, Plaintiff argues his Section 1983 claim is grounded in an equal protection violation based on Defendants' failure to promote Plaintiff due to reverse race discrimination. (Opp. at 3-5.) However, Plaintiff's analysis is based on the standard for Title VII reverse race discrimination claims. (*Id.*) Plaintiff asserts that failure to promote claims based on reverse race discrimination may be brought pursuant to Section 1983 or Title VII. (*Id.* at 4.) Nevertheless, the Third Circuit has expressly stated that such employment-related claims for race discrimination may not be brought pursuant to Section 1983. *Williams v. Pa. Human Rels. Comm'n*, 870 F.3d 294, 299 (3d Cir. 2017) ("Allowing pure Title VII and ADA claims under § 1983 would thwart Congress's carefully crafted administrative scheme by throwing open a back door to the federal courthouse when the front door is purposefully fortified."). Accordingly, summary judgment is granted in Defendants' favor on Count 1.

### B. Section 1981

Defendants argue that Plaintiff's Section 1981 claim must be dismissed because there is no private right of action under Section 1981. (Def. Br. at 15-16.) The Court agrees. The Third Circuit has held that "no implied private right of action exists against state actors under 42 U.S.C. § 1981." *McGovern v. City of Phila.*, 554 F.3d 114, 122 (3d Cir. 2009). Accordingly, summary judgment is granted in Defendants' favor on Count 3.

### C. NJLAD

Defendants likewise move for summary judgment on Plaintiff's NJLAD claim. To establish a prima facie case for failure to promote under the NJLAD, a plaintiff generally must show: "(1) that [he] is a member of a class protected by the anti-discrimination law; (2) that [he] was qualified for the position or rank sought; (3) that [he] was denied promotion, reappointment, or tenure; and (4) that others . . . with similar or lesser qualifications achieved the rank or position." *Glenn v. Lawrence Twp. Police Dep't*, No. 10-3121, 2012 U.S. Dist. LEXIS 37241, at *15 (D.N.J. Mar. 19, 2012) (alterations in original) (quoting *Dixon v. Rutgers, The State Univ. of N.J.*, 541 A.2d 1046, 1051-52 (N.J. 1988)).

However, in cases involving reverse race discrimination, an employee must demonstrate "he has been victimized by an 'unusual employer who discriminates against the majority.'" *Ditzel v. Univ. of Med. & Dentistry*, 962 F. Supp. 595, 603 (D.N.J. 1997) (quoting *Erickson v. Marsh & McLennan Co.*, 569 A.2d 793, 799 (N.J. 1990) (quoting *Livingston v. Roadway Express*, 802 F.2d 1250, 1252 (10th Cir. 1986))). Unlawful discrimination under the NJLAD "may be proven by either direct or circumstantial evidence." *A.D.P. v. ExxonMobil Research & Eng'g Co.*, 54 A.3d 813, 821 (N.J. Super. Ct. App. Div. 2012). Direct evidence of discrimination is evidence "that an employer placed substantial reliance on a proscribed discriminatory factor in making its decision

11

to take the adverse employment action[.]" *McDevitt v. Bill Good Builders, Inc.*, 816 A.2d 164, 168 (N.J. 2003). "The evidence produced must, if true, demonstrate not only a hostility toward members of the employee's class, but also a direct causal connection between that hostility and the challenged employment decision." *Bergen Com. Bank v. Sisler*, 723 A.2d 944, 954 (N.J. 1999). Here, Plaintiff has not set forth any direct evidence of discrimination. Accordingly, Plaintiff must establish unlawful discrimination through circumstantial evidence.

When relying on circumstantial evidence, a plaintiff must present "background circumstances" suggesting that defendants engaged in discrimination. *See Devito v. Bd. of Educ.*, 29 F. App'x 886, 889 (3d Cir. 2002). To support his allegations that Defendants engaged in discrimination, Plaintiff asserts that the Defendants who voted for Rabboh and Rabboh himself are all racial minorities. (Opp. at 6.) However, standing alone, the minority status of individuals who grant or receive preferential employment treatment is not enough to establish background circumstances suggesting discrimination. *Devito*, 29 F. App'x at 889. Plaintiff also asserts that some of Defendants' statements about Rabboh's minority status constitute evidence of discrimination. (Opp. at 7-8.) Furthermore, Plaintiff argues that Defendants' speeches at the August 20 Meeting were centered on Rabboh's race and religion. (Opp. at 9.) In *Wachstein v. Slocum*, the New Jersey Appellate Division explained that "[i]f an employer's statements that he planned to combat discrimination and to pursue affirmative action goals were held to be an adequate basis for a finding of discrimination against a white employee, anti-discrimination laws would be turned on their head and transformed into a device for preservation of the racial status quo in the workforce." 625 A.2d 527, 533 (N.J. Super. Ct. App. Div. 1993). Similarly here, Defendants' statements about Rabboh's minority status, the American Dream, and the value of diversity do not form an adequate basis to establish background circumstances suggesting Defendants engaged in racial

discrimination against Plaintiff. Accordingly, Plaintiff has not established background circumstances to support a prima facie case of reverse race discrimination.

Even if Plaintiff established a prima facie case, his claim would still fail. If a plaintiff establishes a prima facie reverse race discrimination case, the burden of production shifts to the defendant, who must articulate a legitimate, non-discriminatory reason for his or her actions. *Ditzel*, 962 F. Supp. at 603. This burden of production is satisfied if the defendant introduces evidence that, if taken as true, permits a "conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).[8] Here, Defendants proffer several reasons for why they hired Rabboh, including his experience, history of community engagement and outreach, five-year plan, and other strengths as a candidate. (*See, e.g.*, DSMF ¶¶ 62-63.) These reasons are sufficient to satisfy Defendants' burden of production.

Accordingly, summary judgment is granted in Defendants' favor on Count 2.

## IV.   CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (ECF 110) is **GRANTED**. An appropriate order follows.

/s/ Jamel K. Semper
**HON. JAMEL K. SEMPER**
**United States District Judge**

Orig:   Clerk
cc:     José R. Almonte, U.S.M.J.
        Parties

---

[8] Thereafter, the burden shifts back to the plaintiff to prove, by a preponderance of the evidence, that the defendant's purported nondiscriminatory reason was merely a pretext for discrimination. *Zive v. Stanley Roberts, Inc.*, 867 A.2d 1133, 1139 (N.J. 2005). "This is satisfied if a plaintiff can show that '(1) a discriminatory reason more likely motivated the employer than the employer's proffered legitimate reason, or (2) the defendant's proffered explanation is "unworthy of credence."'" *Glenn*, 2012 U.S. Dist. LEXIS 37241, at *17 (quoting *Maiorino v. Schering-Plough Corp.*, 695 A.2d 353, 365 (N.J. Super. Ct. App. Div. 1997) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981))). Plaintiff has not shown that Defendants' proffered reasons are merely a pretext for discrimination.